Affirmed and Opinion filed January 9, 2007








Affirmed and Opinion filed January 9, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00836-CV

____________

 

DONALD DIAS, Appellant

 

V.

 

GOODMAN MANUFACTURING COMPANY,
L.P., GOODMAN HOLDING COMPANY, AND QUIETFLEX MANUFACTURING COMPANY, L.P., Appellees

 



 

On Appeal from the 269th
District Court

Harris County, Texas

Trial Court Cause No. 04-14494

 



 

O P I N I O N








In this retaliatory discharge case, appellant Donald Dias
challenges the summary judgment granted in favor of his employer, Goodman
Manufacturing Company, L.P. (AGoodman@), and related
companies Goodman Holding Company (AGHC@) and Quietflex
Manufacturing Company, L.P. (AQuietflex@).  Dias argues he
was discharged in violation of the Texas Commission on Human Rights Act (ATCHRA@).  Specifically,
Dias contends he was terminated by Goodman because (a) his mother had filed an
age discrimination complaint against Quietflex, (b) appellees perceived Dias as
assisting his mother in prosecuting her claim or as a potential witness on her behalf,
or (c) Dias actually assisted his mother with her age discrimination claim. 
Dias further contends that Quietflex and GHC are part of an integrated
enterprise with Goodman, and asserts a third-party interference claim against
Quietflex.[1] 
Because Goodman did not engage in protected conduct and Texas Labor Code
section 21.055 does not recognize a cause of action for retaliation against a
person who has not personally engaged in a protected activity, we affirm.  See
Tex. Lab. Code Ann. ' 21.055
(Vernon 2006).

I.  Facts and Procedural History

Dias began working for Goodman as a PC analyst in 1996.  He
learned of the job opening from his mother, Shirley Dias, who was employed by
Quietflex.  Quietflex was formerly a department of Goodman until it became a
separate entity in 1993.  In approximately 1998, Dias was promoted to the job
of Network Systems Manager.  

Quietflex terminated Shirley Dias on April 4, 2003.  Within
a day of his mother=s termination, Dias spoke with his
supervisor, Ed Lilley, and with human resources representative Wanda Ford about
her re-employment.  Dias asked if there was anything he could do to help his
mother, and both Lilley and Ford told Dias there was not.  According to Dias,
Lilley told him he was Abetter off being quiet and not to
interfere,@ and that Dias Acould not help her
if [he] was unemployed.@  Dias further testified that Ford told
him A[he] would be best
by not taking it any farther@ and he should Ago back and
basically do [his] job.@








On April 29, 2003, Shirley Dias sent a demand letter to
Quietflex asserting an age discrimination claim.  She filed a charge of age
discrimination against Quietflex with the Equal Employment Opportunity
Commission (AEEOC@) on May 20, 2003.  On or about the same
day, Goodman=s Chief Information Officer, Terry Smith, reported
concerns that Dias and another employee, Charles Espinoza, were accessing other
employees= email mailboxes without the authorization of the
employees concerned.  One week later, Goodman began investigating whether Dias
and Espinoza had in fact accessed employees= email without
their permission.  The investigation indicated that Dias had accessed Lilley=s email mailbox on
December 20, 2002; February 19, 2003; February 21, 2003; May 13, 2003; and June
5, 2003.  Dias had similarly accessed Smith=s mailbox on May
13, 2003.  On June 17, 2003, Dias verbally acknowledged that on May 13, 2003,
he had accessed the mailboxes of Lilley and Smith.  At his employer=s request, Dias
wrote a statement in which he explained, AI had compose[d]
an email which I sent and quickly regretted.  I chose to delete the message
prior to it being read versus recalling it.@  Goodman
immediately terminated Dias=s employment.

On March 22, 2004, Dias filed suit against Goodman,
Quietflex, and GHC for retaliatory discharge under section 21.055 of the
TCHRA.  According to Dias, he was discharged in retaliation for his mother=s claim against
Quietflex and because appellees perceived Dias was assisting his mother in prosecuting
her claims or would testify on her behalf.  Appellees moved for traditional and
no-evidence summary judgment on the grounds that (1) Dias did not engage in a
protected activity; (2) his Aperception of participation or assistance@ claim is not
recognized under Texas law; (3) there was no causal connection between Dias=s participation in
an alleged protected activity and his termination; (4) Quietflex and GHC did
not control access to Dias=s employment opportunities and did not
deny or interfere with that access based on unlawful criteria, or there is no
evidence of such control and interference; and (5) Dias cannot rebut Goodman=s legitimate
reasons for discharging him as pretextual.  The trial court granted appellees= motion for
summary judgment without stating the grounds for its ruling, and this appeal
ensued.








II.  Issues
Presented

In three issues, Dias argues the trial court erred in
granting summary judgment (a) in favor of Goodman on Dias=s retaliation
claim, (b) in favor of Quietflex on Dias=s third-party
interference claim, and (c) in favor of Quietflex and GHC on Dias=s claim that the
three appellees are Aan integrated enterprise.@ 

III.  Standard of Review

We review summary judgments de novo, Valence Operating
Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005), and where the trial court
grants the judgment without specifying the grounds, we affirm the summary
judgment if any of the grounds presented are meritorious.  FM Props.
Operating Co. v. City of Austin, 22 S.W.3d 868, 872B73 (Tex. 2000). 
We consider all grounds the appellant preserves for review that are necessary
for final disposition of the appeal.  See Cincinnati Life Ins. Co. v. Cates,
927 S.W.2d 623, 626 (Tex. 1996).  Here, the appellees moved for summary
judgment on both traditional and no-evidence grounds; thus, we apply the
familiar standard of review appropriate for each type of summary judgment,
taking as true all evidence favorable to the nonmovant, and indulging every
reasonable inference and resolving any doubts in the nonmovant=s favor.  See
Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 157 (Tex. 2004)
(traditional summary judgment); King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 751 (Tex. 2003) (no-evidence summary judgment).  








In a traditional motion for summary judgment, the movant
has the burden of showing that there is no genuine issue of material fact and
it is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Am. Tobacco Co. v. Grinnell,
951 S.W.2d 420, 425 (Tex. 1997).  To be entitled to traditional summary
judgment, a defendant must conclusively negate at least one essential element
of each of the plaintiff=s causes of action or conclusively
establish each element of an affirmative defense.  Sci. Spectrum, Inc. v.
Martinez, 941 S.W.2d 910, 911 (Tex. 1997).  Evidence is conclusive only if
reasonable people could not differ in their conclusions.  City of Keller v.
Wilson, 168 S.W.3d 802, 816 (Tex. 2005).  Once the defendant establishes
its right to summary judgment as a matter of law, the burden shifts to the
plaintiff to present evidence raising a genuine issue of material fact.  City
of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678B79 (Tex. 1979).

In a no-evidence summary judgment, the movant represents
that there is no evidence of one or more essential elements of the claims for
which the non-movant bears the burden of proof at trial.  Tex. R. Civ. P. 166a(i); Green v.
Lowe=s Home Ctrs., Inc., 199 S.W.3d 514,
518 (Tex. App.CHouston [1st Dist.] 2006, pet. denied).  We sustain a
no-evidence summary judgment when (a) there is a complete absence of evidence
of a vital fact, (b) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (c) the
evidence offered to prove a vital fact is no more than a mere scintilla, or (d)
the evidence conclusively establishes the opposite of the vital fact.  Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  ALess than a
scintilla of evidence exists when the evidence is >so weak as to do
no more than create a mere surmise or suspicion= of a fact.@  King Ranch,
Inc., 118 S.W.3d at 751 (quoting Kindred v. Con/Chem, Inc., 650
S.W.2d 61, 63 (Tex. 1983)).  

IV.  Applicable Law








Dias brought this retaliation claim under section 21.055 of
the Texas Commission on Human Rights Act.  See Tex. Lab. Code Ann. ' 21.055 (Vernon
2006).  In an action arising under this statute, the plaintiff must first make
a prima facie showing that: (1) he engaged in a protected activity,
(2) an adverse employment action occurred, and (3) a causal link
existed between the protected activity and the adverse action.  Pineda v.
United Parcel Serv., Inc., 360 F.3d 483, 487 (5th Cir. 2004).  Protected
activities consist of (1) opposing a discriminatory practice;
(2) making or filing a charge; (3) filing a complaint; or
(4) testifying, assisting, or participating in any manner in an
investigation, proceeding, or hearing.  See Tex. Lab. Code Ann. ' 21.055 (Vernon
2006).  The burden then shifts to the defendant to demonstrate a legitimate
nondiscriminatory purpose for the adverse employment action.  Pineda, 360
F.3d at 487.

V.  Analysis

A.      Failure to
Establish a Prima Facie Case of Retaliation

Appellees argue in their motion for summary judgment and on
appeal that Dias failed to make the required prima facie showing of
retaliation.  We agree.

1.       Third-Party
Retaliation

The theory on which Dias relies most heavily is that of
third-party retaliation; that is, Dias argues that he was terminated because
his mother engaged in the protected activity of filing an age discrimination
complaint:

Q:      What is the basis for your belief that your
termination was retaliatory?

A:      My mother was terminated from Quietflex,
and, shortly thereafter, she filed her own discriminatory charges of age
discrimination; and then shortly thereafter, at that point, I was terminated.

Q:      And that=s the sole basis for your belief that you were retaliated
against?

A:      Yes.








The parties do not refer to any cases binding on this court
that accept or reject the legal theory of third-party retaliation as a viable
cause of action under the TCHRA.  We note, however, that the purpose of the
TCHRA is to provide for the execution of the policies of Title VII of the Civil
Rights Act of 1964.[2] 
Tex. Lab. Code Ann. ' 21.001(1) (Vernon
2006); Quantum Chem. Corp. v. Toennies, 47 S.W.3d 473, 476 (Tex. 2001). 
Thus, analogous provisions of Title VII and the cases interpreting them guide
our interpretation of the TCHRA.  Quantum Chem. Corp., 47 S.W.3d at
476.  

There is a split of authority among federal courts
regarding whether a plaintiff may assert a claim for retaliation when his
employer targets him for an adverse employment action because of the protected
activity of a third party such as a friend or relative.  Some cases hold that
recognizing such a cause of action furthers the purpose of federal
anti-retaliation law.[3] 
However, the majority of federal courts who have considered the issue have
refused to recognize third-party retaliation claims as valid causes of action
under federal anti-retaliation laws. [4]      








In our interpretation of comparable Texas law, we begin
with a familiar rule of statutory construction: if the statutory text is
unambiguous, a court must adopt the interpretation supported by the statute=s plain language
unless that interpretation would lead to absurd results.  Tex. Dept. of
Protective & Regulatory Servs. v. Mega Child Care, Inc.,145 S.W.3d 170,
177 (Tex. 2004).  The plain text of section 21.055 is as follows:

An
employer, labor union, or employment agency commits an unlawful employment
practice if the employer, labor union, or employment agency retaliates or
discriminates against a person who, under this chapter:

(1)     opposes a discriminatory practice;

(2)     makes or files a charge;

(3)     files a complaint; or

(4)     testifies, assists, or
participates in any manner in an investigation, proceeding, or hearing.

Tex. Lab. Code Ann. ' 21.055 (Vernon
2006).  Thus, the text of the statute unambiguously requires that the plaintiff
personally engage in protected activity.  








Interpreting the statute in accordance with its unambiguous
language does not lead to absurd results.  As the Third Circuit Court of
Appeals noted, Athere are at least plausible policy
reasons@ why the
legislature might have intended to exclude third-party retaliation claims.  Fogleman
v. Mercy Hosp., Inc., 283 F.3d 561, 569 (3d Cir. 2002), cert. denied,
537 U.S. 824, 123 S. Ct. 112, 154 L. Ed. 2d 35 (2002).  AIn most cases, the
relatives and friends who are at risk for retaliation will have participated in
some manner in a co-worker=s charge of discrimination.  The plain
language of [the statute] will protect these employees from retaliation for
their protected activities.@  Holt v. JTM Indus., Inc., 89 F.3d
1224, 1227 (5th Cir. 1996), cert. denied, 520 U.S. 1229, 117 S. Ct.
1821, 137 L. Ed. 2d 1029 (1997.)  Moreover, the legislature Amay have feared
that expanding the class of potential anti-discrimination plaintiffs beyond
those who have engaged in protected activity to include anyone whose friends or
relatives have engaged in protected activity would open the door to frivolous
lawsuits and interfere with an employer=s prerogative to
fire at-will employees.@  Fogleman, 283 F.3d at 570.

We find this reasoning persuasive, and decline Dias=s request that we
expand the class of people to whom section 21.055 applies.

2.       APerception@ of Assistance








Dias also argues that Goodman, Quietflex, and GHC perceived
him as assisting his mother with her age discrimination claim against
Quietflex; however, no Texas courts follow the rule proposed by Dias that would
allow a plaintiff to maintain an action against his employer for retaliation
where the employer=s adverse employment action was based only
on the employer=s Aperception@ that the
plaintiff engaged in protected conduct.  See Salay v. Baylor Univ., 115
S.W.3d 625, 627 (Tex. App.CWaco 2003, pet. denied) (stating that the
proposed rule Awould effectively discount the plain words of the
statute requiring active participation, interpreting it instead to prohibit
retaliation when the employer perceives that an employee has
participated in an investigation, proceeding or hearing under the
[T]CHRA . . . . However, if the employee has not
actually engaged in activity declared to be protected by the legislature, the
application of a >perception theory= would, in our
view, encroach on the at-will employment doctrine without express legislative
action@); Attieh v.
Univ. of Tex. at Austin, No. 03-04-00450-CV, 2005 WL 1412124, at *7 (Tex.
App.CAustin June 16,
2005, no pet.) (mem. op.) (following Salay and stating, Ait is irrelevant
whether the University mistakenly perceived that Attieh had engaged in a
protected activity because statutorily it could not retaliate against her until
she actually did so.  Likewise, the mere anticipation that Attieh might engage
in a protected activity in the future is insufficient to establish that the
University retaliated against her under the statute.@).

We agree with the reasoning in Salay.  Because the
plain language of section 21.055 addresses only the plaintiff=s actions, it
would be inconsistent with the expressed intent of the legislature and with our
own role as a reviewing court to extend the statute=s scope to
situations in which the employer only perceives that the plaintiff has
engaged in protected activity.[5]
 

3.       Protected
Activity

Dias also argues that he engaged in protected activity;[6]
however, his own testimony describing his conduct establishes that the acts he
performed do not fall within the scope of section 21.055:








Q:      But these are the only two reasons that you
believe the company perceived you as having assisted your mother, because they
knew of your relationship with her and because you helped get her benefits
forms?

A:      Also, I approached my supervisorC

Q:      Okay.

A:      Cand HR [Human Resources] to determine if there was anything
I could do to alter her termination.

Q:      Okay. Let=s start with your supervisor.  When
didC

A:      Ed Lilley.  At the time was Ed Lilley.

Q:      Okay . . . . When did you contact Ed Lilley?

A:      I believe it was the day of [Shirley Dias=s termination].  It may have been
the day after.

Q:      So, this was one conversation or more than
one conversation?

A:      I believe it was actually more than one.

Q:      How many conversations did you have with Ed
Lilley about your mother=s termination?

A:      I would say, in total, probably three.

Q:      And were these all on the day of or the day
after your mother=s termination?

A:      I believe so.  Within that time frame, yes.

Q:      Okay.  Can you tell me about the first
conversation?

A:      ICI can=t divide them up, exactly what
details were discussed during which conversation.  I just know that we
discussed the issue a couple of times.

Q:      Was it a couple of times or three times?

A:      Three times.

Q:      And this was over the course of two days?

A:      Yes.

Q:      Can you tell me about the substance of the
conversations?

A:      The substance of the conversation was that,
you know, I was not unhappy and that I  wasCI was kind of looking for if he thought there was anything
I could do.








Q:      So, you asked him whether he thought there
was anything you could do?

A:      That=s right.  In other words, I was in a bad situation.

Q:      Why were you in a bad situation?

A:      Because it=s my mother and I still need to keep my job.

Q:      So, you asked Mr. Lilley if there was
anything he thought that you could do because you were in a bad situation?

A:      No.  If ICif there=s anything I could do to help my mother.

Q:      And what did he say?

A:      He didn=t think so.

Q:      Is that all he said?

A:      He also advised that I stay quiet.

Q:      Were those the words he used?

A:      Pretty much, yes.

Q:      Did he say anything else?

A:      That was pretty much the gist of it, that I
was better off being quiet and not to interfere, that I could not help her if I
was unemployed.  He also made that comment.

* * * * *

Q:      And you mentioned that you also talked to
someone other than Mr. Lilley?

A:      That is correct.

Q:      Who is that?

A:      Wanda Ford.

Q:      And what was her position?

A:      Her position was basically the same as Ed
Lilley=s, that there was nothing I could
do and that theyCher opinion was I would be best by
not taking it any farther.  And I told her that, okay, I will do my job and not
raise a ruckus or cause a stink or however you want to say that, I will not
cause any problems.

* * * * *








Q:      So, all you really remember her saying is
that there=s nothing you could do and that it
would be best not to take it any farther?

A:      That=s correct.  And she did say, you know, go back and
basically do your job.

Q:      And did you have any conversations with
anyone else at the company about your mother=s termination?

A:      No.  I had people ask me about it, but I did
not answer.

* * * * *

Q:      So, you said that Ed Lilley and Wanda Ford
were the only two Goodman employees that you complained to about your mother=s termination?

A:      I did not complain.  I discussed that with
them.  And that=s all I recall, yes.

Q:      Okay.  So, I=m just trying to get at the reasons you believe that
you were retaliated against.  You said that the company knew of your
relationship with your mother, you helped her get her COBRA forms, you
discussed your mother=s termination with Ed Lilley and
Wanda Ford.  Are there any other reasons that you believe you were retaliated
against?

A:      No.

* * * * *

Q:      And in any of those phone calls or e-mails
[to get Shirley Dias=s COBRA forms] did you ever mention
that you were disturbed about your mother=s termination?

A:      No.

In
sum, the conduct which Dias characterizes as protected activity consists of
asking two people if there was anything he could do to help his mother and
requesting forms related to medical insurance.  These activities do not
constitute opposing a discriminatory practice; making or filing charge; filing
a complaint; or testifying, assisting, or participating in an investigation,
proceeding, or hearing.  Thus, by participating in these conversations and
requests, Dias did not engage in an activity protected by section 21.055.  








Because Dias bases his retaliation claim on activities that
are not protected by section 21.055 and on legal theories that are not
cognizable under Texas law, appellees successfully established that Dias cannot
meet his burden to show a prima facie case of discrimination.  In the absence
of a prima facie case, the burden did not shift to Goodman to demonstrate a
legitimate nondiscriminatory purpose for Dias=s termination;
thus, we affirm summary judgment as to Goodman without reaching Dias=s remaining
arguments that Goodman=s stated reason for terminating him was
pretextual or that his discharge was motivated in part by retaliation.  

B.      Third-Party
Interference and Integrated Enterprise Claims 

In his second issue, Dias argues the trial court erred in
granting summary judgment on his third-party interference claim against
Quietflex.  In his third issue, Dias contends the trial court erred in granting
summary judgment to Quietflex and GHC because, together with Goodman, the three
entities constitute a single Aintegrated enterprise.@  Both claims rely
on the same elements: to maintain a TCHRA suit against a defendant who is not
his direct employer, a plaintiff must show that: (1) the defendant is an
employer within the statutory definition of the TCHRA, (2) some sort of
employment relationship exists between the plaintiff and a third party, and (3)
the defendant controlled access to the plaintiff=s employment
opportunities and Adenied or interfered with that access
based on unlawful criteria.@  NME Hosps.,
Inc. v. Rennels, 994 S.W.2d 142, 147 (Tex. 1999) (emphasis added). 








In their motion for summary judgment, appellees argued that
Dias could not satisfy the third prong of the Rennels test for two
reasons: first, Quietflex and GHC did not control access to Dias=s employment
opportunities, and second, the companies did not deny or interfere with Dias=s access to
employment opportunities based on unlawful criteria.  Dias=s argument and
evidence on the issue of Aunlawful criteria@ consists of the
incorporation by reference of the same arguments and evidence proffered against
Goodman.  Specifically, Dias=s argument regarding Aunlawful criteria@ both at trial and
on appeal consisted of the sentence, AAnd, for all the
reasons stated above, Dias has presented evidence of a retaliatory motive.@  As previously
discussed, Dias=s termination was not retaliatory as that
term is interpreted under the TCHRA.  Thus, the trial court correctly granted
summary judgment in favor of Quietflex and GHC because their interference, if
any, was not based on unlawful criteria.

We overrule Dias=s second and third
issues and affirm summary judgment as to GHC and Quietflex.

VI.  Conclusion

We conclude Dias did not engage in a protected activity,
and further, we decline to recognize the Aperception@ and Athird-party
retaliation@ claims as alleged; therefore, we affirm the trial
court=s grant of summary
judgment.

 

 

/s/      Eva M. Guzman

Justice

 

 

Judgment rendered
and Opinion filed January 9, 2007.

Panel consists of
Justices Anderson, Hudson, and Guzman.

 









[1]  In his Original Petition, Diaz asserts claims of
third-party interference against both Quietflex and GHC, but he appeals the
trial court=s judgment on this claim only with regard to
Quietflex.





[2]  See 42 U.S.C.A. 2000e-17 (West 2003).





[3]  See, e.g., Gonzalez v. New York State Dep=t of Corr. Servs. Fishkill Corr. Facility, 122 F. Supp. 2d 335, 347 (N.D.N.Y. 2000); E.E.O.C.
v. Nalbandian Sales, Inc., 36 F. Supp. 2d 1206, 1210 (E.D. Cal. 1998); McKenzie
v. Atl. Richfield Co., 906 F. Supp. 572, 575 (D. Colo. 1995); De Medina
v. Reinhardt, 444 F. Supp. 573, 580 (D.D.C. 1978).  





[4]  See, e.g., Fogleman v. Mercy Hosp., Inc., 283
F.3d 561, 569 (3d Cir. 2002), cert. denied, 537 U.S. 824, 123 S. Ct.
112, 154 L. Ed. 2d 35 (2002) (addressing provisions of the Age Discrimination
in Employment Act and the Pennsylvania Human Relations Act and stating, AAlthough . . . recognizing
third-party retaliation claims is more consistent with the purpose of the
anti-discrimination statutes, we cannot say that prohibiting such claims is an
absurd outcome that contravenes the clearly expressed intent of the legislature@); Smith v. Riceland Foods, Inc., 151 F.3d 813,
819 (8th Cir. 1998) (holding that the A[proposed]
ruleCthat a plaintiff bringing a retaliation claim need not
have personally engaged in statutorily protected activity if his or her spouse
or significant other, who works for the same employer, has done soCis neither supported by the plain language of Title
VII nor necessary to protect third parties, such as spouses or significant
others, from retaliation@); Holt v. JTM Indus., Inc., 89 F.3d 1224, 1227
(5th Cir. 1996), cert. denied, 520 U.S. 1229, 117 S. Ct. 1821, 137 L.
Ed. 2d 1029 (1997) (holding that a spouse who has not participated in protected
conduct does not have automatic standing to sue for retaliation); Thompson
v. N. Am. Stainless, LP, 435 F. Supp. 2d 633, 638B40 (E.D. Ky. 2006) (discussing the lack of binding
precedent and holding that the plain language of analogous federal statute 42
U.S.C. ' 2000e-3(a) does not permit a retaliation claim
by a plaintiff who did not personally engage in protected activity); Shoecraft
v. Univ. of HoustonBVictoria, No. Civ.A. V-03-85, 2006 WL 870432, at *3 (S.D. Tex.
March 28, 2006) (A[T]he mere existence of a marital relationship between
the employee engaged in protected activity and his/her spouse is not a
sufficient connection to impute protected activity to that spouse@); Singh v. Green Thumb Landscaping, Inc., 390
F. Supp. 2d 1129, 1138 (M.D. Fla. 2005) (refusing to recognize the plaintiff=s cause of action for retaliation Abased solely on his close association with his wife
who engaged in protected activity@); Higgins
v. TJX Cos., Inc., 328 F. Supp. 2d 122, 123 (D. Me. 2004) (holding that
neither Title VII nor analogous state law recognizes a cause of action for
retaliation against a person who has not personally engaged in protected
conduct); U.S.E.E.O.C. v. Bojangles Rest.,Inc., 284 F. Supp. 2d 320, 327
(M.D.N.C. 2003) (AIt is entirely possible that Congress could have
written the statute as it did to eliminate frivolous suits by friends,
relatives, or acquaintances of persons who do fall within the language of the
statute@); Horizon Holdings, L.L.C. v. Genmar Holdings,
Inc., 241 F. Supp. 2d 1123, 1143 (D. Kan. 2002) (AThe only federal circuit courts to have addressed this
specific issue, however, have concluded (albeit sometimes reluctantly) that the
plain text of Title VII=s anti-retaliation provision and analogous provisions
in other federal anti-discrimination statutes do not make actionable
retaliation against an employee who has not engaged in protected activity.@). 





[5]  A review of the record also reveals less than a
scintilla of evidence that appellees perceived Dias to be assisting his mother
in her age discrimination claim.  At best, appellees knew that Dias helped his
mother obtain COBRA benefit forms:

Q:         [In your petition], it states that you were
perceived by defendants as having assisted, participated with, and supported
your mother in her EEOC proceeding and/or as being a potential witness on your
mother=s behalf.  How were you perceived by defendants?

A:         You mean perceived by the company?

Q:         Right.

A:         They knew of my relationship with my
mother, that she was my mother.  That was public knowledge.  They also know
that I was helping her.  I helped her get her benefits after her termination
due to lack of company response.

Q:         And this was the COBRA forms that you gotC

A:         COBRA.  That=s correct.

Q:         How else were you perceived by the company
in this way?

A:         Excuse me?

Q:         How else were you perceived by the company
as having assisted, participated with, or supporting your mother in her EEOC
proceeding and/or as being a potential witness on your mother=s behalf?

A:         I=m
not sure how they perceived that.

Moreover, appellees produced evidence that Dias was
not perceived to be assisting his mother in her age discrimination claim and
was not considered a potential witness.





[6]  Although not raised in his original petition, the
issue was addressed in the appellees=
motion for summary judgment and Dias=s
reply and was tried by consent.